2015 OK 16

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Jasen Randal ELIAS a.k.a. Jasen Randal Corns, Respondent.**

**No. SCBD–6235.**

Supreme Court of Oklahoma.

March 30, 2015.

**ORDER**

¶ 1 Upon consideration of (1) Respondent's Affidavit, prepared in compliance with Rule 8.1, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A, in which Respondent, Jasen Randal Elias a.k.a. Jasen Randal Corns requests that he be allowed to relinquish his license to practice law and to resign from membership in the Oklahoma Bar Association, and (2) Complainant's Application for Order Approving Resignation,

¶ 2 THE COURT FINDS AND HOLDS:

¶ 3 During the pendency of disciplinary proceedings against him, Jasen Randal Elias a.k.a. Jasen Randal Corns offered, on March 13, 2015, to surrender his license to practice law and to resign from Bar membership.

¶ 4 Respondent's act of surrender and resignation was freely and voluntarily made without coercion or duress. Respondent is fully aware of the legal consequences that will flow from his resignation.

¶ 5 Respondent is aware of pending investigations by the Bar's general counsel into grievances made against him. Respondent is aware that there is a two count Formal Complaint filed against him currently pending before the Oklahoma Supreme Court, alleging violations of professional duties and the oath of an attorney. If proven, these griev-

ances would constitute violations of Rules 1.8, 1.14, 1.16(a), 4.2, and 8.4, Oklahoma Rules of Professional Conduct, 5 O.S.2011, Ch.1, App. 3–A, Rules 1.3, 5.2, and 5.4 Oklahoma Rules Governing Disciplinary Procedures, 5 O.S. 2011, Ch. 1, App. 1–A; and Respondent's oath as a licensed Oklahoma lawyer.

¶ 6 The grievances contain these client allegations:

## Count I

¶ 7 In 2005, Respondent began assisting his law firm's client, Elizabeth Stambaugh, with a guardianship of her disabled daughter and husband of 60 years, who was suffering from advanced Parkinson's disease and Alzheimers. At that time, Respondent was 34 years old and Stambaugh was 83 years old. Stambaugh's husband died in November 2005, leaving Stambaugh with considerable assets and as the sole trustee of a revocable trust, with full authority to distribute its assets.

¶ 8 Respondent developed a personal relationship with Stambaugh which went far beyond the professional bounds of an attorney-client relationship. Respondent advised Stambaugh that he owed his adoptive father who was gravely ill a large sum of money to repay his undergraduate education. On April 20, 2006, Stambaugh wrote Respondent a check for $160,000 for him to repay his adoptive father, and Respondent accepted the $160,000 gift from his client. Later that year, Respondent told Stambaugh he could not spend more time with her because he had to work to pay his home mortgage. On September 5, 2006, Stambaugh transferred $153,838.42 to pay off the balance of Respondent's mortgage, and Respondent accepted the gift.

¶ 9 In January 2007, Respondent opened his own practice and took Stambaugh as a client to his new law firm. Respondent represented Stambaugh on multiple matters, and Stambaugh paid Respondent's invoices and additional retainer fees. In addition to the legal fees, in 2007, Respondent accepted over $12,000 in gifts for himself and $36,000 in gifts for his three children from Stambaugh. In October 2006, Respondent advised Stambaugh regarding the amendment or restatement of her will and trust. In the Third Restatement of Stambaugh's trust, Respondent was named as the beneficiary of the balance or residue of the trust estate. Respondent billed Stambaugh for preparing the new estate planning documents, and for the phone conversation and meetings with Fred Stoops, the lawyer Respondent arranged for Stambaugh to hire to finalize the amended estate planning documents.

¶ 10 In 2008, in addition to legal fees Respondent collected from Stambaugh, Respondent accepted over $12,000 in gifts for himself and $36,000 for his children. In March 2008, Stambaugh amended her trust and made Respondent a 40% beneficiary of the trust estate. Respondent told Stambaugh he could not devote more time to her because he needed to work to repay his student loans. On September 26, 2008, Stambaugh transferred $98,447.38 to pay off the balance of Respondent's student loans, and Respondent accepted this gift. Also, on September 29, 2008, Stambaugh wrote a check for $53,477.50 to pay off the balance on Respondent's vehicle, and Respondent accepted this gift. In November 2008, Stambaugh amended her trust to remove Respondent as a beneficiary.

¶ 11 Respondent informed Stambaugh that his neighbors had stolen several items from his garage. On March 12, 2009, Stambaugh transferred $579,000 to the Jasen R. Corns Revocable Living Trust for the purchase of a residence for Respondent, and Respondent accepted the gift. In July 2009, Respondent advised Stambaugh regarding the amendment of her trust in order to again make him a beneficiary. On August 12, 2009, Stambaugh amended her trust and made Respondent a 40% beneficiary, and on November 13, 2009, Stambaugh amended her trust and removed Respondent as a beneficiary. On November 18, 2009, Stambaugh paid taxes on Respondent's new home in the amount of $6,300, and Respondent accepted the gift. In 2009, Respondent also accepted over $12,000 in gifts for himself and $36,000 for his children.

¶ 12 In 2010, in addition to legal fees collected by Respondent from Stambaugh, Re-

sponded accepted over $12,000 in gifts for himself and $36,000 for his children. In February 2010, Respondent again advised Stambaugh regarding amending her trust to add Respondent as a beneficiary. On February 11, 2010, Stambaugh restated her trust and named the trustee of the Jasen Corns Trust as a 40% beneficiary of the trust estate. On March 10, 2010, Stambaugh amended her trust and designated Respondent and the Trustee of the Jasen Corns Trust as 40% beneficiaries of the trust estate. The amendment also allowed discretionary distributions to be made in any amount for Respondent's health, legal, or emergency needs and to support Respondent in the manner of living to which he is accustomed. These changes reflected handwritten notes Respondent had prepared and given to Stambaugh prior to amendment. On August 9, 2010, Respondent was removed as beneficiary of Stambaugh's trust.

¶ 13 In September 2010, Stambaugh sued Respondent for abuse of his role as a fiduciary and for undue influence to obtain gifts. After the filing of the lawsuit, Respondent sent an email to multiple individuals regarding an article the Tulsa World was going to publish concerning the relationship between Stambaugh and Respondent, and the pending lawsuit. In the email, Respondent stated he thought Stambaugh now had dementia, and that he had previously cut ties with her due to her inappropriate behavior, but that the two had reconciled as she agreed to stay away from his family and he wanted the annual payments/gifting.

¶ 14 During the lawsuit, Respondent communicated with Stambaugh regarding actions she needed to take to dismiss her lawsuit, despite the fact she was represented by counsel. Respondent's communications included cards with affectionate overtones and requests for forgiveness. On February 16, 2011, after Respondent met with Stambaugh alone without permission of her attorney, Stambaugh instructed her attorneys to dismiss her lawsuit against Respondent. On February 23, 2011, Respondent hand-delivered a letter to Stambaugh informing her she may employ him as an attorney. On February 25, 2011, by contract prepared by Stambaugh, Stambaugh re-engaged Respondent for general matters and assistance and to reserve Respondent's time as Stambaugh desired. The contract stated Stambaugh would not seek legal advice through Respondent alone.

¶ 15 In July 2011, pursuant to a settlement agreement to dismiss a pending guardianship proceeding brought by Stambaugh's family members, Stambaugh created an irrevocable trust prohibiting Respondent from receiving any distributions from Stambaugh's trust. However, in August and September 2011, Stambaugh wrote checks to Respondent for $2,000, $1,641, and $4,000. In addition, in September 2011, Respondent took Stambaugh to a dealership where she purchased a vehicle for $27,274. Respondent and members of his family then possessed and used this vehicle exclusively until the co-trustee's of Stambaugh's trust demanded its return to Stambaugh. Respondent later returned the vehicle to Stambaugh.

¶ 16 On September 19, 2011, a co-trustee demanded Respondent return monies Stambaugh distributed to him between April 2011 and September 2011 and take nothing further. In November 2011, Respondent emailed Stambaugh's employees stating he believed Stambaugh was heading down a path that would lead her to being deemed incompetent and subject to guardianship. Respondent continued to discuss estate planning matters with Stambaugh. Writings memorializing these conversations show Respondent advised Stambaugh to name him as a beneficiary to her trust. Respondent also recommended new attorneys and asset managers to make changes and challenge the trust.

¶ 17 While at Stambaugh's home In March 2012, Respondent bought tickets to the Ryder Cup in the amount of $3,096.52 on Stambaugh's credit card. When the co-trustee of Stambaugh's trust discovered the purchase, she cancelled it. Then, in May 2012, Respondent used Stambaugh's credit card to pay $3,750 to Federal Tax Relief for services rendered to Respondent, and Respondent identified Stambaugh as his "mother" when using her credit card information.

¶ 18 During the course of the relationship, Stambaugh purchased numerous trips for them with the belief Respondent would accompany her, but before the departure date of each trip, Respondent would cancel. During the course of the relationship, Respondent knew Stambaugh was romantically interested in him and he took advantage of her affections and abused his position of trust as her attorney to unduly influence her to gift him in excess of one million dollars.

## Count II

¶ 19 On December 18, 2012, Dr. Mark Waller was appointed as Stambaugh's general guardian. As guardian, on February 19, 2013, Waller filed a grievance against Respondent with the Oklahoma Bar Association. On June 13, 2013, Respondent sent Jim Wegar, co-trustee of Stambaugh's trust, a letter demanding that complaints against Respondent, pending with the Department of Human Services and Oklahoma Bar Association, be dismissed, and stating that Stambaugh needs to quit harassing Respondent and his family. If his conditions were not met, Respondent threatened to exercise his options to resume answering Stambaugh's phone calls or file a lawsuit detailing her letters, voicemails, and conduct.

¶ 20 Throughout the proceedings, Respondent threatened to exploit recordings and other potentially embarrassing materials he collected of Stambaugh in an attempt to make Stambaugh, her guardian, trustee, or attorneys dismiss her complaints. On October 22, 2014, during his sworn deposition taken by the OBA, Respondent made numerous misrepresentations to the Bar concerning transactions between he and Stambaugh.

¶ 21 On February 13, 2015, Complainant moved the Trial Panel to deem the allegations contained in the Complaint admitted due to Respondent's failure to file a responsive pleading within the time required by Rule 6.4 of the Rules Governing Disciplinary Proceedings. On February 19, 2015, the Trial Panel entered its Order deeming the allegations in the Complaint admitted.

¶ 22 Respondent waives any and all right to contest the allegations in a bar disciplinary proceeding.

¶ 23 Respondent recognizes, understands and agrees that he may not apply for reinstatement of his legal license (and of his membership in the Bar) before the expiration of five years from the effective date of this order.

¶ 24 Respondent agrees to comply with Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, and acknowledges that his license to practice law may be reinstated only upon compliance with the conditions and procedures prescribed by Rule 11, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A.

¶ 25 Respondent acknowledges that his actions may result in claims against the Client Security Fund and agrees to reimburse the Fund for any disbursements made or to be made because of his actions, with applicable statutory interest, prior to the filing of any application for reinstatement.

¶ 26 Respondent acknowledges the OBA has incurred costs in the investigation and prosecution of this matter, and agrees he is responsible for reimbursement of these costs. He requests, without objection from Complainant, sixty days to pay the costs. On March 13, 2015, the OBA filed its Application to Assess Costs itemizing costs in the amount of $1,504.82, and requesting reimbursement from Respondent of this amount.

¶ 27 Respondent's resignation during the pendency of disciplinary proceedings is in compliance with Rule 8.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A.

¶ 28 Respondent's name and address appear on the official Bar roster as: Jasen Randal Elias, a.k.a. Jasen Randal Corns, Post Office Box 410, Jenks, Oklahoma 74037.

¶ 29 THE COURT THEREFORE ORDERS THAT the resignation of Jasen Randal Elias a.k.a. Jasen Randal Corns tendered during the pendency of disciplinary proceedings is approved; the respondent's name is stricken from the Roll of Attorneys and he may not apply for reinstatement of his license to practice law (and of his membership in the Bar) before the lapse of five years from the date of this order; repayment to

the Client Security Fund for any money disbursed (or to be disbursed) because of respondent's conduct shall be a condition of respondent's reinstatement; respondent shall comply with Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A.

¶ 30 It is further ordered that the petitioner pay costs in the amount of $1,504.82 within sixty days from the date of this order. Any consideration of any future Rule 11 petitions is conditioned upon such payment.

¶ 31 DONE BY ORDER OF THE SUPREME COURT this 30th day of March, 2015.

ALL JUSTICES CONCUR.